**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

InJAH TAFARI,

                                    Plaintiff,

          v.                                              No. 10-CV-1065
                                                              (GTS/DRH)
WILLIAM D. BROWN; SHERYL BUTLER;
JOHN W. CARVILL; CHARLES M. DEVANE;
ROCHE FRANK; GLENN S. GOORD; PETER
HEALY; ZVI JACOB; KAREN LaPOLT;
LUCIEN J. LeCLAIRE, JR.; DAVID L.
MILLER; ARTHUR MORGENSTERN; JOHN
H. NUTTAL; THOMAS POOLE; RICHARD
ROY; ROSEMARIE WENDLAND; JEAN
YOST; and S. ZENZEN,

                                    Defendants.
_____

**APPEARANCES:**                        **OF COUNSEL:**

InJAH TAFARI
Plaintiff Pro Se
89-A-4807
Upstate Correctional Facility
Post Office Box 2001
Malone, New York 12953

HON. ERIC T. SCHNEIDERMAN            CHARLES J. QUACKENBUSH, ESQ.
Attorney General for the             Assistant Attorney General
   State of New York
Attorney for Defendants
The Capitol
Albany, New York 12224-0341

**DAVID R. HOMER**
**U.S. MAGISTRATE JUDGE**

**REPORT-RECOMMENDATION AND ORDER**[1]

       Plaintiff pro se InJah Tafari ("Tafari"), an inmate in the custody of the New York State

_____
       [1]This matter was referred to the undersigned for report and recommendation
pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

Department of Corrections and Community Services ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants, eighteen DOCS employees, violated his constitutional rights under the First, Eighth, and Fourteenth Amendments.  Second Am. Compl. (Dkt. No. 38).  Presently pending is (1) Tafari's motion to compel (Dkt. No. 117); (2) defendants' motion to dismiss pursuant to 28 U.S.C. § 1915(g) (Dkt. No. 118); and (3) defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56 (Dkt. No. 122). Tafari opposes both of defendants' motions.  Dkt. Nos. 120, 124, 125.  For the following reasons, it is recommended that (1) Tafari's motion be denied, (2) defendants' motion to dismiss be denied, and (3) defendants' motion for summary judgment be granted in part and denied in part.

## I. Background

The facts are related herein in the light most favorable to Tafari as the non-moving party.  See subsection II(A) infra.

Tafari initially filed this case in the Southern District of New York.  Dkt. entry dated 9/3/2010.  The Southern District severed and transferred Tafari's claims against those defendants who were outside of the Southern District, resulting in the present case.[2]  Tafari v. Annets, No. 06-CV-11360 (GBD/AJP) (Dkt. No. 85) adopted in its entirety (Dkt. No. 88) (hereinafter Tafari I).  Additionally, on January 28, 2008, Southern District defendants Annets, Jacobsen, Lurenz, Kern, and Chill moved for summary judgement.  Tafari I, Dkt. No. 88 at 1.  The Southern District granted the motion, finding that Tafari had failed to

---

[2] The paragraphs in the second amended complaint relating to the defendants and incidents which occurred in the Northern District of New York begin at paragraph 37.

establish (1) the personal involvement of Rabbi Chill or (2) claims that his First Amendment rights were violated when he was denied meals during transports.  Tafari I, Dkt. Nos. 86, 88.

## A. Religious Meals

Tafari is Jewish[3] and received kosher meals, also known as the cold alternative diet ("CAD"), while incarcerated.  Second Am. Compl. ¶ 13; see also Prack Decl. (Dkt. No. 122-4) ¶ 11 ("Jewish inmates requesting a kosher diet are provided meals known as the 'cold alternative diet.'"); Tafari Dep. (Dkt. No. 122-8) at 19 (stating that Tafari's religious designation to DOCCS was Jewish); Dkt. No. 124-6 at 3 .  The CAD was not a vegetarian diet.  Schattinger Decl. (Dkt. No. 122-6) ¶ 43.  Tafari requested to be provided with vegetarian kosher diet, or alternate food choices to the CAD menu, both of which were repeatedly denied.  Second Am. Compl. ¶ 14; see also Dkt. No. 38[4] at 24 (listing Tafari's suggestions for kosher vegetarian substitutions for the CAD), Id. at 27 (listing Tafari's suggestions for kosher vegetarian substitutions for Jewish holiday meals); Tafari Dep. at 10-11, 17 (explaining that the sect of Judaism that he followed adhered to the Torah which directed that followers should be vegetarians).

---

[3] Tafari identifies himself as a "Jewish/Hebre/Israelit/Ethiopian (Orthodox Jew-ism), Nayabinghi House of Jah Rastafari, a Rastarfarian sect of the line of Judah."  Tafari Dep. (Dkt. No. 122-8) at 6-7; Dkt. No. 124-6 at 3.  However, Tafari clarified that despite the name, this is no different than being Jewish.  Tafari Dep. at 9-10.  Accordingly, DOCCS records continue to identify Tafari as Jewish.  Dkt. No. 124-6 at 3.

[4] Tafari has provided identical copies of these attachments throughout his submissions in response to defendants' motions.  For the sake of brevity, these duplicate filings will not also be cited.

Defendants stated that this meal option was not offered to inmates.  Second Am. Compl. ¶ 51; see also Schattinger Decl. ¶ 46 ("Over the years the DOCCS has considered the necessity and feasibility of a kosher vegetarian menu.  Due to fiscal and practical considerations, and in light of the fact that there is no established Jewish dietary stricture requiring vegetarianism, [DOCCS] has determined that such a menu will not be provided."); Tafari Dep. at 54-58 (explaining that defendants McClary, Gore and Fischer all informed Tafari, in writing, that vegetarian kosher meals were not available).  Instead, "[i]nmates who were vegetarian could partake in the meatless 'religious alternative diet' whether or not their vegetarianism had anything to do with a religious faith."  Prack Decl. ¶ 12.

Tafari also requested vegetarian kosher holiday meals, which defendants also failed to provide.  Second Am. Compl. ¶ 15.  Further, Tafari requested to be provided with kosher bag lunches while being transported from one facility to another, and upon being received at facilities, which were also denied.  Id. ¶¶ 18-19.  As a result of receiving kosher meals, Tafari "has and continue[s] to suffer from stomac[h] cramps and pain, vomit[t]ing three . . . to four . . . times per week, and weight loss."  Id. ¶ 23.   In this action Tafari seeks, inter alia, injunctive relief to have kosher bagged lunches provided to inmates during transport as well as vegetarian kosher meals provided to inmates at all times.  Second Am. Compl. ¶ B at p. 19.

### 1. January 24, 2005

On January 24, 2005, Tafari was transferred from Auburn Correctional Facility ("Auburn") to Eastern Correctional Facility ("Eastern").  Second Am. Compl.  ¶ 37.  Tafari immediately made requests, both verbally and in writing, for kosher meals to defendants

4

Miller, Wendland and Butler, but those requests were denied until March 24, 2005.  Id. ¶ 37.

Tafari wrote to Miller requesting religious meals, specifically the CAD, on January 30,

February 13 and 27, and March 13, 2005, and also to the Inmate Grievance Resolution

Committee (IGRC)[5] on March 23, 2005.  Dkt. No. 124-22 at 40-47.  For those eight weeks,

Tafari "only [ate] dry cereal, bread, and drank water," due to defendants "denial to provide

[Tafari] with vegetarian kosher meals."  Id. ¶ 37.

On March 21, 2005, Tafari wrote to Goord complaining that he was being harassed and

intentionally denied the CAD, which he had specifically requested.  Dkt. No. 124-22 at 33-

34.  Defendant Nuttal responded on Goord's behalf, stating that an investigation was

initiated regarding Tafari's complaints.  Id. at 35.  A grievance was also filed.  Id. at 44-47.

The grievance regarding the allegations of harassment was denied, and stated that "there is

no evidence to substantiate the allegations . . . in this complaint."  Id. at 49.  The decision

was upheld by CORC.  Id. at 50.  Additionally, on April 15, 2005, Wendland wrote a

memorandum to Tafari explaining that the allegations of harassment were being handled by

the grievance committee and that his CAD meals were provided to him "as soon as proper

notification was received from the facility Chaplain."  Id. at 52.


### 2. July 13 - 15, 2005

On July 13, 2005, Wendland and Butler removed Tafari from the kosher meal list

---

[5]The IGP [Inmate Grievance Program] is a three-step process that requires an inmate to: (1) file a grievance with the IGRC; (2) appeal to the superintendent within four working days of receiving the IGRC's written response, and (3) appeal to the CORC [Central Office Review Committee] ... within four working days of receipt of the superintendent's written response."  Abney v. McGinnis, 380 F.3d 663, 668 (2d Cir.2004) (internal citations omitted).

without Tafari's permission.  Second Am. Compl. ¶ 38.  Tafari filed a grievance, explaining

that he was offered a regular meal, which he refused, which led to his removal from the

kosher meal list.  Dkt. No. 124-22 at 3.  On July 14, 2005, defendant Rabbi Frank authored

a letter explaining that he had received a call about Tafari's request to terminate his CAD,

so Frank initiated the paperwork for the CAD to be terminated as of July 15th.  Dkt. No. 124-

22 at 8.  However, Frank was called again that day and told to reinstate Tafari on the CAD.

Id.  Frank agreed because there was an apparent miscommunication and Tafari only

intended to refuse a single meal and this was Tafari's first request to terminate the CAD.

Id.  Ultimately, Tafari went without a kosher meal for two and a half days, drinking only

water through July 15, 2004.  Second Am. Compl. ¶ 38.  Tafari's grievances and appeals

regarding the incident were all denied.  Dkt. No. 124-22 at 9-11.


### 3. Holiday Meals

Defendants Healy, LaPolt, Wendland and Brown denied Tafari kosher holiday meals for

Yom Kippur, from October 13 through October 26, 2005, due to his placement in the

Special Housing Unit ("SHU")[6].  Second Am. Compl. ¶ 39.  Defendants Healy, LaPolt,

Wendland, and Brown denied Tafari his religious meals during Hanukkah between

---

[6]SHUs exist in all maximum and certain medium security facilities.  The units
"consist of single-occupancy cells grouped so as to provide separation from the general
population . . . ."  N.Y. Comp. Codes R. & Regs. tit. 7, § 300.2(b).  Inmates are confined in
a SHU as discipline, pending resolution of misconduct charges, for administrative or
security reasons, or in other circumstances as required.  Id. at pt. 301.  Tafari has been
placed in SHU or keeplock for a variety of disciplinary infractions.  Prack Decl. (Dkt. No.
122-4) ¶ 7.  Additionally, due to his disciplinary history, Tafari is slated to remain in SHU or
keeplock through November 2016.  Id.; see also Dkt. No. 122-5 (copy of Tafari's
disciplinary history).

December 26, 2005 and January 2, 2006 because he was confined in SHU and receiving a restricted diet due to his disciplinary sentence imposed December 27, 2005.  Id. ¶ 44.

Defendants Miller, Wendland, Butler, Healy, LaPolt and Brown also denied Tafari his religious meals during Passover from April 24 through May 1, 2005 because he was confined in SHU.  Second Am. Compl. ¶ 45.  Tafari claims he was also denied the Passover meals the following year, from April 12 through April 19, 2006, also because he was housed in SHU.  Id. ¶ 45; Dkt. No. 124-22 at 67.  Tafari received a memorandum from Brown during the 2006 Passover explaining that he would be provided with food from the State Passover menus, as he was.  Dkt. No. 124-22 at 68.

Tafari grieved the denial of the 2006 Passover meals.  Dkt. No. 124-22 at 25-28, 69-72. Tafari complained that he was provided only with the food items from the DOCCS menu and none of the additional foods which were brought "from the fund raiser and into the facility by Rabbi Frank . . . . " Dkt. No. 122-24 at 25.  Tafari stated that these were the same complaints he had in 2005 when he was denied the outside Passover foods.  Id. at 26.  The grievance was denied because Tafari "was provided with approved Passover meals from the statewide menu [and] . . . is not entitled to any additional foods while housed in SHU." Id. at 30.  The grievance denial was affirmed by both the Superintendent and CORC.  Id. at 31-32.  Defendant Brown also wrote Tafari a letter on April 27, 2006, advising that he was "not entitled to any additional foods while housed in SHU."  Id. at 73.[7]

---

[7] While not alleged in the second amended complaint, Tafari made similar complaints about being denied special food during Passover in 2007.  Dkt. No. 124-23 at 89.  Nuttal responded, emphasizing that Tafari was given the holiday meal menu approved by DOCCS and that he was not allowed "to store kosher food items that were donated from the community," like the inmates in general population because, being in SHU, he did not "have the same privileges as general population inmates."  Id.

7

While at Five Points Correctional Facility ("Five Points"), defendant Poole and Yost denied Tafari kosher holiday meals during Yom Kippur from October 1, 2006 through October 16, 2006 because of his SHU confinement.  Second Am. Compl.  ¶ 49.  Tafari was also denied his holiday meals by Poole, Yost and Sensen for Hanukkah between December 16, 2006 through December 23, 2006.  Id. ¶ 50.  Tafari was again told that this was due to his confinement in SHU.  Id. ¶ 50.  Tafari wrote to LeClaire and filed multiple grievances, requesting that his religious beliefs be honored by providing him with vegetarian kosher holiday meals, vegetarian kosher daily meals, and transfer to Green Haven Correctional Facility.  Dkt. No. 124-23 at 27-29, 32, 36-44.  Moreover, Tafari's grievance stated that he was losing weight constantly and vomiting daily.  Id. at 32.  The grievance was denied.  Id. at 33-34.  Tafari appealed the denials unsuccessfully.  Id. at 34-35.  Tafari's grievance regarding the provision of special meals for Hanukkah were also denied because DOCCS did not provide special meals to anyone for Hanukkah and, instead, the CAD was provided per directive.  Id. at 47-48.  Tafari appealed, stating that there were multiple different kinds of special foods consumed by Jewish individuals during Hanukkah; however, CORC denied the appeal reiterating the fact that "here are no special meals prepared for Hanukkah.  Id. at 48-49.

### 4. Vegetarian Kosher Meals

"In the 1990s, after instituting the state-wide general confinement menu, the Office of Nutritional Services began to consider reasonable menus by which to accommodate other dietary preferences . . . . " Schattinger Decl. ¶ 14.  These menus were developed primarily for those with food allergies, religious considerations, and vegetarians.  Id.  ¶ 15;

8

see also Dkt. No. 124-3 at 9 (DOCCS policy indicating that inmates may eat a diet consistent with their religious beliefs).  In 1993, the religious alternative menu was enacted which "is not a separate menu [but] . . . an alternative entree added to the general confinement menu."  Schattinger Decl. ¶¶ 17-18.  Inmates in SHU or keeplock were required to submit a request for an alternative menu.  Id.  ¶ 21.  If an inmate chose an alternate entree, of the twenty-one meals fed during the week, approximately nineteen of the meals included a meatless or vegetarian entree.  Id.  ¶¶ 23-26.  However, "the alternative may or may not be kosher, depending on the particular food item and the way that it is prepared."  Id. ¶ 43.

In addition, meals included side dishes, dessert, and a beverage so that an inmate who chose not to eat the entree, for whatever reason, would still have enough food to receive a nutritionally adequate diet.  Schattinger Decl. ¶¶ 34-35.  "Catering [any further] to the dietary preferences of each of the approximately 55,000 inmates in this State would pose an unreasonable financial burden on the taxpayers and an impossible administrative burden on DOCCS."  Id. ¶ 27; see also Id.  ¶¶ 29-33 (explaining that having a vegetarian alternative for every meal was explored but determined to be too administratively and financially burdensome); but see Tafari Decl. (Dkt. No. 124) ¶¶ 29-31 (contending that he created a vegetarian kosher meal by rotating menu options already on the CAD).

Jewish inmates were offered kosher meals; "[h]owever, most DOCCS correctional facilities do not have kosher kitchens or facilities to prepare on-site kosher meals . . . [so] Jewish inmates who request a kosher diet are served the CAD."  Schattinger Decl. ¶ 38.

> A CAD meal typically consists of a sandwich made with kosher
> meat or cheese, condiments, chips, a cookie or cake, and juice.
> Some items for the CAD meals are prepared and packed at the

9

> FPC, in kosher compliant conditions, under rabbinical supervision.
> *i.e.* juices, salads, cold cuts and cheese.  Some specific items *e.g.*
> canned fruits come through outside kosher suppliers.  Such items
> come pre-packaged and sent to individual correctional facilities for
> use in preparing the CAD meals.

Id.  ¶ 39.  Tafari received three CAD meals per day.  Tafari Dep. at 79.

Tafari never received vegetarian kosher meals from defendants Miller, Wendland,

Butler, Healy, LaPort or Brown while he was incarcerated at Eastern.  Second Am. Compl.

¶ 47; see also Dkt. No. 124-22 at 76 (letter from LeClaire dated April 24, 2006 explaining

that there were no vegetarian kosher diets but that Tafari could choose from either the CAD

or religious alternative meal which was non-meat); Dkt. No. 124-22 at 81 (same yet dated

May 19, 2006).  As discussed above, vegetarian kosher meals were not provided by any of

the facilities for a variety of reasons including cost, feasibility, and religious tenets which did

not require vegetarianism.  Schattinger Decl. ¶¶ 46-49.

On May 23, 2006, Tafari was transferred to Five Points and requested that defendants

Poole and Yost provide him with a vegetarian kosher diet.  Second Am. Compl. ¶ 48.  The

defendants denied his request, so Tafari ate dry cereal and bread for eight and a half

weeks until the normal kosher diet was regularly provided to him.  Id. ¶ 48.  Tafari made

another request for vegetarian kosher meals on June 30, 2006, and his request was denied.

Id. ¶ 51.  Poole, Yost, and LeClaire denied this request stating that vegetarian kosher meals

were not a meal option for inmates.  Id. ¶ 51.  Tafari also filed a grievance on June 30, 2006

about the denial of kosher foods (Dkt. No. 124-23 at 13) and was advised again that there

was no vegetarian kosher diet and that he had also failed to designate the diet he wished,

as that designation did not automatically occur based on an inmate's religious designation

(Dkt. No. 124-23 at 14).

On April 6, 28, and May 3, 2006, Tafari sent Goord a letters requesting vegetarian kosher meals.  Second Am. Compl. ¶ 52.  Goord referred the letters to Nuttal for a response and Nuttal denied the requests on May 22, 2006.  Id. ¶ 52.  On June 30, 2006, Tafari again requested to Goord that he be provided with vegetarian kosher meals.  Id. ¶ 58.  Goord again directed Nuttal and DeVane to respond to Tafari on Goord's behalf.  Id. ¶ 58.  On July 24, 2006, Nuttal responded that "there [we]re no provision or plans to provide a vegetarian kosher diet [to inmates]."  Id. ¶ 59.  Additionally, on August 7, 2006, DeVane responded, denying Tafari's requests, stating that "[n]utritional services does not provide a vegetarian kosher diet."  Id. ¶ 59.

"Absent an emergency, administrators at each facility have no authority to deviate from Departmental menus without the prior approval of the Office of Nutritional Services."  Prack Decl.  ¶ 15; see also Schattinger Decl. (Dkt. No. 122-6) ¶ 9 (same),  Lempke Decl. ¶ 8 (Dkt. No. 122-3) (explaining that neither the Superintendent nor the Deputy Superintendent for Administration had the "authority to modify or deviate from the statewide menus which have been developed by the DOCCS Office of Nutritional Services.").  Thus limiting an inmate to any menu other than those approved by the state, such as dry cereal, bread and water, "would be an unauthorized departure from DOCCS policy."  Prack Decl. ¶ 15.  Food services at Five Points was managed by the Deputy Superintendent for Administration.  Lempke Decl. (Dkt. No. 122-3) ¶ 8.

Tafari also requested to defendant rabbis Frank, Jacob, Chill and Morgenstern to assist in obtaining  vegetarian kosher meals.  Second Am. Compl. ¶ 65.  These requests were also denied allegedly due to racial discrimination.  Id. ¶ 65; see also Tafari Dep. at 59-62 (stating that he was told that individuals of color were not allowed to participate in the

program by various rabbis).  Tafari lost weight because he was "not provided with a full

nutritional balanced meal because [he is] not eating."  Tafari Dep. at 66; see also Dkt. No.

124-23 at 68-69 (letter dated April 16, 2007 claiming that meals were making him vomit

daily and lose weight).  The same day, defendant ZenZen responded to Tafari in a

memorandum explaining that his requests for vegetarian kosher meals had already been

addressed through the grievance program and that medical issues should be brought to the

attention of Medical staff so that they could attend to Tafari's digestive problems.  Dkt. No.

124-23 at 70.


### 5. Medical Records

As previously discussed, Tafari contends that he suffered various physical ailments.

Medical records indicate that when Tafari entered Doccs custody in 1989, he was to receive

vegetarian meals.  Dkt. No. 124-19 at 2-3.  From 1994 through 1997, Tafari was provided a

therapeutic diet for his allergy to meats.  Id. at 4-17.[8]  However, no clinical records indicate

that, other than Tafari's subjective statements, he had any food allergies.  Prior discovery in

other cases which Tafari has filed in the Second Circuit indicate that medical documentation

indicated that "there [wa]s no medical documentation of red meat allerg[ies] . . . ." and that

requested diet changes during this time period were not medically indicated.  Tafari v.

Weinstock, No. 07-CV-693, 2010 WL 3420424, at *6 (W.D.N.Y. Aug. 27, 2010) (Dkt. No.

122-1 at 133-41).  Complaints regarding deliberate indifference based upon his diet and its

---

[8] Tafari provided affidavits from other inmates with allergies to meats, fish, and
dairy who also received the CAD and, instead of the meat or dairy options, were provided
with other alternatives such as extra peanut butter and jelly packets or lunch meat.  Dkt.
No. 124-24 at 6-10.

impact on his alleged allergies were thus dismissed.  Id.

In April and September, 2009 and February 2010, Tafari underwent radiological studies on his abdomen after experiencing symptoms of constipation and vomiting.  Dkt. No. 124-19 at 18-20.  All studies were unremarkable, showing stool in his bowels and arriving at a diagnosis of constipation.  Id.  In the Summer of 2010, Tafari received a colonoscopy due to his chronic constipation and family history of cancer.  Id. at 22.  The results are unknown. Id.


### B. Kosher Food Program at Green Haven Correctional Facility

In the early 1980s, prior to the development of the CAD, "an experimental pilot program [was initiated at Green Haven whereupon] DOCCS build and began operating a kosher food service facility . . .  [where h]ot kosher meals are prepared . . . ."  Schattinger Decl. ¶ 40.  The menu at Green Haven was created by the facility's food administrator and Jewish chaplain but was not a vegetarian menu.  Id.  ¶ 41.  Tafari contends otherwise.  Tafari Dep. at 68.  Conversely, "[a]s closely as possible . . . [it] parallels the menu offered to the general inmate population."  Schattinger Decl. ¶ 41.  Moreover, "[w]hile there is a non-meat alternative to the meat entrees on the general population menu, there is no such alternative to the meat entrees on the Green Haven hot kosher food menu."  Id.; see also Id. ¶ 43 (clarifying that the menu provided at the Green Haven facility is not a vegetarian kosher menu).  Expanding this program to other facilities would be "extremely expensive and administratively burdensome," so while the Green Haven food service continues it "cannot be provided statewide."  Id. ¶ 42.  Finally, "the Green Haven program [is limited] to Jewish inmates with good disciplinary records."  Id.; see also Tafari Dep. at 62-63 (explaining that

13

he was told the Green Haven program was an Honors Program for inmates who did not had

been free of disciplinary sanctions for a period of years).

Tafari continually requested transfer to Green Haven Correctional Facility ("Green

Haven") to participate in their kosher food program.  Second Am. Compl. ¶ 17, Tafari Dep.

at 70-71; see also Second Am. Compl. ¶ 51 (defendants Poole, Yost, and LeClaire denied

request for the program).  The requests were continually denied because Tafari did not

meet the placement requirements.  Second Am. Compl. ¶¶ 17,  51 (denied because

"present placement was appropriate.").  During his twenty years in prison, Tafari was

involved in approximately fifty-two Tier III disciplinary hearings and fifty-three Tier II

disciplinary hearings.[9]  Tafari Dep. at 74-75.  Tafari was instructed that in order to be

considered for the Green Haven program he needed to have one year free of convictions

for either Tier II or Tier III disciplinary hearings.  Id. at 75.  Tafari contends that he went

without a disciplinary charge between 2003 and 2004 for twenty months, but instead of

granting his request for Green Haven, he was transferred to Eastern.  Id. at 75-76.

Tafari wrote to Goord requesting transfer to the Green Haven Kosher Food Program as

well.  Second Am. Compl.  ¶ 54.  On April 30, 2004, Goord referred the request to Nuttal for

response and on May 13, 2004, Nuttal denied Tafari's request and directed him to take up

his wishes to transfer facilities with his corrections counselor.  Id. ¶ 54; Dkt. No. 124-21 at 5.

Tafari also made a similar request to his corrections counselor, but the counselor never

---

[9]DOCCS regulations provide for three tiers of disciplinary hearings depending on
the seriousness of the misconduct charged.  A Tier II hearing, or disciplinary hearing, is
required whenever disciplinary penalties not exceeding thirty days may be imposed.  N.Y.
Comp. Codes R. & Regs. tit. 7, §§ 253.7(iii), 270.3(a).  A Tier III hearing, or
Superintendent's hearing, is required whenever disciplinary penalties exceeding thirty days
may be imposed.  Id.

responded.  Second Am. Compl. ¶ 55.  On April 30, 2004, Tafari filed a grievance because

he had failed to receive a response from his corrections counselor about his request.  Dkt.

No. 124-21 at 6-7.  The grievance was denied because the Green Haven program was an

honors program requiring that the inmate be free from disciplinary dispositions for a year "to

even be considered for participation in the program[; thus,] . . . Tafari [was] . . . ineligible."

Dkt. No. 124-21 at 8.  Tafari appealed the denial.  Id.  Tafari's appeal was denied by the

Superintendent, so he again appealed to CORC.  Id. at 9-11.  Tafari disagreed with any

religious program being designated as an Honors Program, citing equal treatment for all

who practiced religion.  Id. at 10-11.  The appeal was again denied, stating that through the

CAD Tafari's religious and dietary needs were being met.  Id. at 12.

On July 6, 2004, Tafari's corrections counselor and the deputy superintendent

approved his transfer to the Green Haven Kosher Food Program.  Second Am. Compl. ¶

57.  Defendant Carvill then denied the transfer request, stating that due to Tafari's poor

custodial adjustment, he was an inappropriate candidate for the program.  Id. ¶ 57.  On July

19, 2004, Tafari filed a grievance about the denial of his transfer.  Dkt. No. 124-21 at 13-18.

The grievance was denied, explaining that the transfer submission was on July 6, 2004 but

that Tafari was projected to be in SHU through July of 2007.  Id. at 19.  This decision was

not made at the facility level.  Id.  Tafari appealed, and the denial was upheld for the same

reasons that the denial came not from the facility but from Classification and Movement.  Id.

at 19-20.  Tafari again appealed, alleging that the real reason for his denial was racially

motivated.  Id. at 20.  This appeal was again denied by CORC, citing Tafari's poor custodial

adjustment as the reason for the denial and restating that all of Tafari's religious needs,

including his diet, are currently being accommodated.  Id. at 21.  The grievance was also

investigated and reached the same conclusion for the denials.  Id. at 22-23.

On August 14, 2006, Tafari again requested to defendants Goord, Nuttall, Roy, and Carvill that he be transferred to Green Haven for the Kosher Food Program.  Second Am. Compl. ¶ 60; Dkt. No. 124-23 at 55-56.  Defendants denied Tafari's request.  Second Am. Compl. ¶ 60; Dkt. No. 124-23 at 58 (memorandum from Deputy Superintendent of Program Services at Five Points explaining that due to letter trails it appears "that transfer to Green Haven is not an option at this time."); Dkt. No. 124-23 at 59 (letter from Classification and Movement explaining that Tafari is "not eligible for requested transfer due to [his] poor custodial adjustment [and the] . . . present placement at Five Points . . . is appropriate.").  On September 7, 2006, Tafari received a letter from Nuttal explaining that:

> [Tafari's] behavior was exemplary from January 2004 though January 2005 and the department considered [his] request for a transfer to the vicinity of the Green Haven Hub.  Eastern is in close proximity to this area, so it seems [his] request was honored.  When [Tafari was] at Green Haven in 1998 and 1999, [he] amassed several Tier 2 and Tier 3 reports and [he was] transferred due to [his] unsuitable behavior.  It is unlikely that [Tafari] would be returned to that facility.

Dkt. No. 124-23 at 60.  Tafari wrote to LeClaire regarding his denials to the Green Haven program.  Id. at 61-65.  Tafari was instructed by Nuttal to make all subsequent facility transfer requests to his Corrections Counselor.  Id. at 66.

Tafari also requested defendant Rabbis Frank, Jacob, Chill and Morgenstern to assist him in obtaining transfer to the Green Haven meal program.  Second Am. Compl. ¶ 65.  These requests were also denied, Tafari contends, due to racial discrimination.  Id. ¶ 65.  Tafari alleges that all inmates who participated in the kosher food program at Green Haven were European while all African American and Hispanic inmates who were Jewish were

incarcerated at other DOCCS facilities where they were served the CAD diet.  Id. ¶ 67;
see also Dkt. No. 124-24 at 11-16 (affidavits from three inmates claiming that at various
times throughout the last three decades, black or hispanic inmates were not allowed to
enter, work, or participate in the Green Haven hot food program).  Grievances were
subsequently filed which were denied finding that any allegations against defendant Rabbi
Jacobs for making racial remarks or discriminating against Tafari were unfounded.  Dkt. No.
124-23 at 25-26, 51-52.  However, Tafari has included an affidavit from another inmate
asserting that the inmate overheard the rabbi make discriminatory statements to Tafari.
Dkt. No. 124-24 at 20-21.


### C. Restricted Diet

On December 18, 2005, Tafari was placed on a pre-hearing restricted diet by
defendants Healy and Brown as a result of disciplinary sanctions.  Second Am. Compl. ¶¶
21, 40.  During this time, Tafari did not receive his kosher diet.  Id. ¶ 21.  Healy and Brown
were aware that Tafari "adhe[arded] to a stric[t] vegetarian kosher diet."  Id. ¶ 40.  However,
DOCCS records indicate that Tafari was not placed on a restricted diet until eleven days
later, though disciplinary dispositions could have been overturned and the records
destroyed.  Prack Decl. ¶¶ 16-17.  The restricted diet "consists of a single serving of loaf
bread (high in fiber, made with vegetables and wheat flour), cabbage and water.  While it is
nutritionally adequate, it is designed to respond to specific types and circumstances of
inmate misconduct."  Id. ¶ 13.  Loaf is utilized in "serious disciplinary situations [where the]
interests of facility security must override considerations such as religious dietary
preferences."  Id.

On December 22, 2005 the restricted diet was suspended by defendant Healy.  Second Am. Compl. ¶ 41.  Between December 18 and 22 Tafari only drank water.  Id. ¶ 41.  The restricted diet was reinstated on December 27, 2005 by Healy and Brown until January 2, 2006, and then again from January 5 through January 9, 2006.  Id. ¶ 42; but see Prack Decl. ¶ 16 (indicating that Tafari was on a restricted diet from December 27, 2005 through January 12, 2006), Tafari Dep. at 94 (indicating that he was on the non-kosher loaf diet for fourteen days).  On December 31, 2005, an unidentified facility physician noted that Tafari "was suffering from weight loss, head pain, chest pain, dizziness, and hearing voices as a result of not eating during the restricted diet sanction."  Second Am. Compl. ¶ 43; see also Prack Decl. ¶ 18 (explaining that medical staff examined inmates on the loaf diet every day).  The statement from the doctor that examined Tafari on December 21, 2005 instead indicates that the doctor informed Tafari "that by not eating he was jeopardizing his pending surgery."  Dkt. No. 124-22 at 23.

### D. Dreadlocks

While Tafari has identified himself as Jewish, he also contends that due to his religious beliefs via "his 'Vow of Nazarite'" his hair should grow into long braids known as dreadlocks.  Second Am. Compl. ¶ 22; see also Tafari Dep. at 13-15 (explaining that Rastafarianism and Judaism are one and the same).  On April 24, 2003, defendant LeClaire released a memorandum stating that dreadlocks were only appropriate for those of the Rastafarian faith.  Dkt. No. 125-4 at 5 (copy of memorandum explaining that dreadlocks were only appropriate for Rastafarians because "dreadlocks do provide a potential hiding place for drugs, weapons and other contraband.  Further the hairstyle makes it impossible . . . to run .

18

. . fingers through [inmate's] hair as part of an authorized pat frisk."), Second Am. Compl. ¶¶ 22, 62, Tafari Dep. at 89.  Because Tafari iwa not a Rastafarian according to DOCCS, defendants refused to allow him to wear his hair in dreadlocks.  Second Am. Compl. ¶¶ 22, 63.

DOCCS initiated a policy on inmate grooming standards which outlined the length of hair and any exemptions thereto.  Dkt. No. 124-4 at 2-4.  Rules of inmate grooming, including regulations regarding hair, were enforced by line officers, including correctional officers, sergeants, and lieutenants.  Lempke Decl. ¶ 9.  Tafari was directed by defendant Poole to cut his hair or receive disciplinary sanctions.  Second Am. Compl. ¶¶ 63-64.  Tafari refused and was given disciplinary sanctions.  Id. ¶ 64; see also Tafari Dep. at 90 (explaining that every thirty days he is given the choice to cut his hair or receive a Tier II disciplinary charge).  However, there were no "particular displinary incident[s] . . . ." specified.  Lempke Decl. ¶ 10.[10]  Tafari included misbehavior reports written about his failure to follow direct orders and have his hair cut on November 30, 2006 and February 22 and March 22, 2007.  Dkt. No. 124-8.  While Tafari received a thirty day disciplinary sanction for the first misbehavior reports, the subsequent reports resulted in Tafari being counseled and reprimanded.  Dkt. no. 124-8 at 4, 6, 9.

Tafari filed multiple grievances regarding this issue.  Dkt. No. 124-23 at 112, 113-17.  The grievances were denied because only members of the Rastafarian faith were allowed dreadlocks.  Id. at 112, 115, 118, 119, 120.  The denials were unsuccessfully appealed.  Id.

_____

[10] SHU records indicate that Tafari "has continuously been in keeplock or in SHU confinement since May of 2003[ and b]ecause of many disciplinary violations, he is currently sentenced to remain in SHU or keeplock through to November of 2016."  Prack Decl. (Dkt. No. 122-4) ¶ 7.

at 111, 115, 119, 121. A DOCCS directive allowed inmates to become exempted from the hair regulations via receiving a court order restraining DOCCS from enforcing the hair length requirements.  Lempke Decl. ¶ 11; see also Dkt. No. 124-4 at 2-4 (copy of DOCCS directive on inmate grooming standards).  Tafari was aware of this exemption as demonstrated by his request, and subsequent permission, to be exempted from the beard and mustache requirements in February 2001 because of his religious affiliation.  Dkt. No. 124-5 at 2-4.

In 2007, Tafari challenged his prior disciplinary convictions and attempted to acquire an exemption for his hair as well, petitioning courts for clarification as whether he was Jewish, Rastafarian, or Orthodox Jew based upon his designation as a "Ethiopian Orthodox Jew and/or Jah Rastafari."  Leonard Aff. (Dkt. No. 124-9) ¶¶ 7, 12; Dkt. No. 124-10.  It was ultimately determined that Tafari was entitled to an exemption and that the prior two disciplinary determinations finding him guilty of failing to follow a direct order to cut his hair should be administratively reversed and expunged.  Tafari Decl. (Dkt. No. 124) ¶ 20; Dkt. No. 124-10 at 4-5.  On July 22, 2010, the disciplinary convictions were reversed.  Tafari Decl. ¶ 21; Dkt. No. 124-11 at 2-4.[11]

## II. Discussion

Tafari alleges violations of his First Amendment rights when defendants failed to

---

[11] These three convictions followed the misbehavior reports in 2006 and 2007 noted above.  Dkt. No. 124-11 at 2 (reversing disposition from December 14, 2006 regarding incident which occurred on November 30, 2006), 3 (reversing disposition from March 1, 2007 regarding incident which occurred on February 22, 2007), 4 (reversing disposition from March 28, 2007 regarding incident which occurred on March 22, 2007).

provide him with kosher meals during distinct time periods, failed to provide him with holiday food, failed to provide him with a vegetarian kosher diet, refused to transfer him to Green Haven, and insisted that he cut his dreadlocks.  Tafari also contends his Eighth Amendment rights were violated when defendants failed to provide him with a vegetarian kosher diet which affected his overall health and when they placed him on the restricted loaf diet. Defendants alternatively seek dismissal and summary judgment contending that Tafari has failed to allege personal involvement of the managerial defendants and does not have meritorious claims.  Additionally, defendants contend that they are protected by qualified immunity.


## A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Facts are material if they may affect the outcome of the case as determined by substantive law.  Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).  All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts.  Matsushita Elec. Indus. Co. v. Zenith

Radio Corp., 475 U.S. 574, 586 (1986).  It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment.  Gallo v. Prudential Residential Servs. 22 F.3d 1219, 1223-24 (2d Cir. 1994); Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988).

When, as here, a party seeks dismissal or summary judgment against a pro se litigant, a court must afford the non-movant special solicitude.  See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006); see also Sealed Plaintiff v. Sealed Defendant #1, 537 F.3d 185, 191 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds pro se, ... a court is obliged to construe his pleadings liberally.'" (citations omitted)).  However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion; the requirement is that there be no genuine issue of material fact.  Anderson, 477 U.S. at 247-48.

### B. Injunctive Relief

To the extent that Tafari requests injunctive relief, such requests are moot as he has been transferred from Eastern and Five Points and is now housed at Upstate Correctional Facility.  See Prins v. Coughlin, 76 F.3d 504, 506 (2d Cir. 1996) ("It is settled in this Circuit that a transfer from a prison facility moots an action for injunctive relief against the transferring facility.") (citations omitted).  Accordingly, to the extent Tafari seeks injunctive relief, that claim for relief should be dismissed as moot.

## C. 28 U.S.C. § 1915(g)

Defendants seek dismissal of the complaint under 28 U.S.C. § 1915(g) (Dkt. No. 118), which bars prisoners from proceeding in forma pauperis (IFP) after three or more previous claims have been dismissed as frivolous, malicious, or for failing to state a claim. See 28 U.S.C. § 1915(g) (2006).[12]  Frivolous claims "lack[] an arguable basis either in law or in fact." Tafari v. Hues, 473 F.3d 440, 442 (2d Cir. 2007) (quoting Neitzke v. Williams, 490 U.S. 319, 325 (1989)). Malicious claims are filed with the intent to hurt or harm another. Id. (citations omitted). The failure to state a claim applies a parallel definition from Fed. R. Civ. P. 12(b)(6), but "it does not follow that a complaint which falls afoul of the [12(b)(6) motion to dismiss] standard will invariably fall afoul of the [§ 1915(g) standard]." Neitzke, 490 U.S. at 326; see also Tafari, 473 F.3d at 442 (citations omitted).

This "three-strikes" provision contains a narrow exception which permits suits, notwithstanding prior dismissals, when the prisoner is "under imminent danger of serious physical injury." 28 U.S.C. § 1915(g); see also Lewis v. Sullivan, 279 F.3d 526, 531 (7th Cir. 2002) (applying  imminent danger exception "[w]hen a threat or prison condition is real and proximate, and when the potential consequence is 'serious physical injury.')   In determining whether the imminent danger provision applies, the court must evaluate whether the claimed danger was still in existence when the complaint was filed and whether such danger was sufficiently serious  in light of the liberal standards accorded to pro se plaintiffs,  to require protection. Chavis v. Chappius, 618 F.3d 162, 169-70 (2d Cir. 2010)

---

[12] The three-strikes provision was adopted as part of the Prison Litigation Reform Act ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1995), which had as its principal purpose deterring frivolous prisoner litigation.  Nicholas v. Tucker, 114 F.3d 17, 19 (2d Cir. 1997).

23

(citations omitted).  Additionally, dismissal is not precluded by the fact that Tafari has already been granted IFP status in this action.  Dkt No. 2.  When a court becomes aware of three prior strikes only after granting IFP status, it is appropriate to revoke that status and bar the complaint under § 1915(g).  See McFadden v. Parpan, 16 F. Supp. 2d 246, 247 (E.D.N.Y. 1998).

Tafari does not dispute defendants contentions that he has received three strikes.  Tafari Mem. of Law (Dkt. No. 120) at 1-2.  In fact, Tafari agrees with the three strikes that the defendants have identified -- (1) the first in May of 2000 with the dismissal of Tafari v. Aidala et. al., 00-CV-405 (Tafari II); (2) the second in April of 2002 with the dismissal of the appeal in Tafari II; and (3) the third in May of 2007 with the dismissal of the appeal in Tafari v. France et. al., 01-CV-11.  Defs. Mem. of Law (Dkt. No. 118-1) at 4-5; Quakenbush Decl. (Dkt. No. 118-2) ¶ 5; Tafari Mem. of Law at 1-2.  There is also no dispute that this action was filed in the Southern District on October 25, 2006.

Defendants claim that the three strikes provision applies, citing to other cases which Tafari has filed which have been dismissed on this basis during the pendency of the present case.  See Dkt. No. 118-3 at 34-69.  However, those cases were filed after 2007.  The present action was filed in 2006, seven months prior to Tafari receiving his third strike.  The three strikes provision expressly prevents inmates from bringing an IFP civil claim again **after** they have acquired three or more strikes on prior occasions.  28 U.S.C. § 1915(g) (emphasis added).  Accordingly, "[d]ismissals that post-date the filing of the action in question may not count as 'strikes' under § 1915(g)."  Zaire v. Welch, No. 03-CV-629, 2008 WL 934426, at *4 (N.D.N.Y. March 31, 2008) (citing cases) (attached to this Report-Recommendation as Ex. 1).  As Tafari's third strike post-dated the filing of the present

24

complaint, it cannot be used as a strike.  While Tafari's subsequent requests for IFP have been properly denied, as demonstrated by defendants, his present status as IFP must be maintained since he had only acquired two strikes as of the filing of the instant suit.

Therefore, defendants' motion on this ground should be denied.


### D. First Amendment

Tafari alleges that his First Amendment rights were violated when he was denied (1) religious meals from January 24 through March 24, 2005; (2) approximately two days of kosher meals due to a misunderstanding and change in meal designation preference; (3) holiday meals; (4) a vegetarian kosher diet; (5) transfer to the Green Haven program; and (6) the ability to wear dreadlocks.

The First Amendment protects the right to free exercise of religion.  See generally Cutter v. Wilkinson, 544 U.S. 709, 719 (2005).  "Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause."  Ford v. McGinnis, 352 F.3d 582, 588 (2d Cir. 2003) (citing Pell v. Procunier, 417 U.S. 817, 822 (1974)).   This right is not absolute and can be limited due to the inmate's "incarceration and from valid penological objectives – including deterrence of crime, rehabilitation of prisoners, and institutional security."  O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987) (citations omitted); see also Benjamin v. Coughlin, 905 F.2d 571, 574 (2d Cir. 1990) ("The governing standard is one of reasonableness, taking into account whether the particular regulation . . . is reasonably related to legitimate penological interests.") (citations omitted).

The Turner Court determined that the four factors to be considered are: 1) whether

25

there is a rational relationship between the regulation and the legitimate government interests asserted; 2) whether the inmates have alternative means to exercise the right; 3) the impact that accommodation of the right will have on the prison system; and 4) whether ready alternatives exist which accommodate the right and satisfy the governmental interest.

Benjamin, 905 F.2d at 574 (citing Turner v. Safely, 483 U.S. 78, 89-91 (1987).

### 1. Failure to Provide Meals

The Second Circuit has held "that prison authorities must accommodate the right of prisoners to receive diets consistent with their religious scruples." Kahane v. Carlson, 527 F.2d 492, 495 (2d Cir. 1975).  This includes providing kosher food to those of the Jewish faith.  Bass v. Coughlin, 800 F. Supp. 1066, 1071 (N.D.N.Y. 1991) (citing Kahane, 527 F.2d 492).  Therefore, to "deny prison inmates the provision of food that satisfies the dictates of their faith . . . unconstitutionally burden[s] their free exercise rights." McEachin v. McGuinnis, 357 F.3d 197, 203 (2d Cir. 2004).  "Courts, however, are reluctant to grant dietary requests where the cost is prohibitive, or the accommodation is administratively unfeasible." Benjamin, 905 F.2d at 579.

### a. January 24 - March 24, 2005

In this case, Tafari's allegations that defendants Miller, Goord, Wendland, and Butler failed to respond to his repeated requests for a kosher diet succeed in establishing a question of material fact about why Tafari failed to receive his kosher meals for eight weeks after his arrival at Eastern.  Tafari wrote four letters to Miller requesting the meals, all of which went without response.  Tafari also wrote to Goord, who forwarded the letter to

26

Nuttal, who responded that an investigation was commencing.  Later, Tafari received a letter from Wendland that his meals would begin after he appropriately notified the Chaplain.  Defendants state that because Tafari continued to eat dry cereal, bread, and water, any self imposed restrictions on his diet were due to Tafari's actions and not defendants.  Viewing the facts in the light most favorable to Tafari, it appears that while his diet was unrestricted after transferring to Eastern, it was not designated as kosher. Therefore, for eight weeks Tafari failed to receive his religious meals.

While not specified in the Turner factors, Second Circuit case law regarding inmate free exercise claims incorporates a "threshold [showing] that the disputed conduct substantially burdens his sincerely religious beliefs."  Salahuddin, 467 F.3d at 274-75 (citing Ford, 352 F.3d at 591).  Accordingly, Tafari must allege or prove more than an inconsequential burden on his religious rights.  Salahuddin, 467 F.3d at 275 (citations omitted).  In this case, failing to provide Tafari with eight weeks of religious meals constitutes a heavy burden on his religious rights.  Unlike cases where only a handful of meals were missed, Tafari was precluded from receiving his meals for weeks thus creating a First Amendment violation. See Rapier v. Harris, 172 F.3d 999, 1006 n.4 (7th Cir. 1999) (affirming summary judgment because "the unavailability of a non-pork tray . . . at three meals out of 810 does not constitute more than a de minimis burden . . . [as there] has [been] no[] alleg[ation of] a routine or blanket practice of denying him pork-free meals.").

Accordingly, defendants' motion on this ground should be denied.[13]

---

[13] For the reasons stated infra in subsection II(F), such claims fail as Tafari has failed to establish the personal involvement of defendants Goord, Miller and Butler. Therefore, these claims remain only as to Wendland and Nuttall.

**b July 13 - 15**

Conversely, for the same reasons stated above, Tafari has failed to establish a First Amendment claim against defendants Wendland, Butler, or Frank for stopping his kosher meals for two days.

The denial of two days worth of kosher food did not constitute more than a de minimus burden.  See McEachin, 357 F.3d at 203 n.6 (holding that, "[t]here may be inconveniences so trivial that they are most properly ignored . . . [thus] the time-honored maxim de minimis non curat lex[14] applies."); see also Rapier v. Harris, 172 F.3d 999, 1006 n.6 (7th Cir. 1999) ("De minimis burdens on the free exercise of religion are not of constitutional dimension."); Thomas v. Picio, No. 04-CV-3174, 2008 WL 820740, at *6 n.8 (S.D.N.Y. Ma.h 26, 2008) (finding that the denial of all kosher meals for one or two days was "not a substantial burden" which was actionable) (attached to Report Recommendation as Ex. 2).  Much like Thomas, Tafari was denied two days of meals, with no other complaints of meal problems thereafter.  Furthermore, the cessation of the diet was based upon a miscommunication between defendants and Tafari which, as soon as it was identified, was rectified so that Tafari would continue to receive kosher meals.  This behavior was, at worst, negligence on behalf of the staff which is insufficient to establish liability under § 1983.  Davidson v. Cannon, 474 U.S. 344, 347 (1986) (holding "that § 1983 provides no remedy for the . . . negligence found in this case . . . . ") (internal quotation marks and citations omitted); Poe v. Leonard, 282 F.3d 123, 145 (2d Cir. 2002) ("[M]ere negligence is insufficient as a matter of law to state a claim under section 1983.").  Furthermore, such complications resulted in a

---

[14]This phrase translates as "the law does not concern itself with trifles." Gottlieb Dev. LLC v. Paramount Pictures Corp., 590 F. Supp. 2d 625, 632 (S.D.N.Y. 2008).

de minimis burden on Tafari's religious practice.  As such, he has failed to state a First Amendment claim.

Accordingly, defendants' motion as to this claim should be granted.

### c.  Holiday Meals

Tafari claims that he was denied his 2005 and 2006 meals for Yom Kippur[15], Hanukkah, and Passover.  Tafari specifically grieved the Passover and Hanukkah meals.  Tafari was told that he was provided with the CAD meals for Passover and was not eligible for any additional foods donated to the inmates by the Jewish community due to his disciplinary conviction.  Furthermore, Tafari was provided was the CAD meals during Hanukkah which, despite Tafari's arguments to the contrary, did not include any alternative, special menu.

First, Tafari's complaints do not concern meals which are part of a recognized religious service.  The meal does not have singular importance as those recognized to constitute a First Amendment deprivation.  See Ford v. McGinnis, 352 F.3d 582, 594 n.12 (2d Cir. 2003) (holding that a meal associated with a large religious feast "is unique in its importance within [the religion] to distinguish the present case from those in which the mere inability to provide a small number of meals commensurate with a prisoner's religious dietary restrictions was found to be a de minimis burden) (citations omitted).

Instead, Tafari alleges that he did not receive additional or special food associated with

---

[15] The facts surrounding the alleged denial of the Yom Kippur meals are not further detailed.  Accordingly, the conclusory allegations are insufficient to state a claim. Moreover, assuming that Tafari's complaints were similar to those advanced about either Passover or Hanukkah, such claims are also insufficient to establish a constitutional violation for the reasons discussed infra.

these holidays.  This claim fails to allege that he was not provided with appropriate religious meals, but only that he did not receive the religious meal that he desired.  Thus, the failure to either provide additional, donated food from the community or a new menu for Hanukkah caused a disagreement between Tafari and staff about his choice of religious menus but not the deprivation of a meal which comported with his religious beliefs.  Accordingly, this incident did not impose any cognizable burden on the free exercise of Tafari's religious rights.

Second, even if denial of additional food or an alternate menu constituted a cognizable burden, it was a de minimus one.  See subsection (b) supra.  Accordingly, viewing the evidence in the light most favorable to Tafari, he has still alleged and proven only a de minimus burden on his religious exercise which is insufficient to state a First Amendment claim.

Defendants' motion as to these claims should be granted.

### d.  Vegetarian Kosher Diet

Tafari alleges that his religious strictures required a vegetarian kosher diet.  Tafari contends that the failure of defendants to provide him with such meals led to physical harm.[16]  Defendants argue that the provision of such a diet was extremely expensive and administratively burdensome and thus was not a feasible alternative.  Moreover, defendants

---

[16] In a previous case, Tafari alleged that he required a vegetarian diet due to his medical conditions that he was allergic to meat and fish.  Tafari v. Weinstock, 2010 WL 3420424 (W.D.N.Y. Aug. 27, 2010) (Dkt. No. 122-1 at 133-41).  Due to the lack of clinical evidence supporting his alleged serious medical needs, Tafari's claims were dismissed.  Id., at *6.

argue that there were a plethora of vegetarian choices provided, though not necessarily all kosher, in addition to the CAD, which was kosher.  Additionally, if an inmate chooses to forego his entree, meals also came with side dishes, dessert, and a beverage to ensure a nutritionally adequate diet.

As previously stated, inmates have a right to receive diets consistent with their religious beliefs; however, courts have been reluctant to grant such accommodations where those dietary requests are cost prohibitive or not administratively feasible.  Benjamin, 905 F.2d at 579 (citations omitted).  In this case, provision of a special vegetarian kosher diet for Tafari is precisely the type of diet which courts are reluctant to order based upon the administrative difficulties faced by defendants.

In a prior, similar case in the Northern District, where defendants argued that despite an inmate's alleged physical health concerns, a low sodium diet which also complied with his religious tenets was overly burdensome, Judge Suddaby granted defendants' motion for summary judgment based upon an analysis of the Turner factors.  See Hamilton v. Smith, No. 06-CV-805 (GTS/DRH), 2009 WL 3199520 (N.D.N.Y. Sept. 30, 2009) (attached to Report Recommendation as Ex. 3).  In that case, the inmate's need for a low sodium diet was established.  Conversely, in the present case, Tafari's medical information fails to indicate that he had allergies or required a vegetarian diet based upon various health concerns.  Even if that were the case, Tafari's claims would still be without merit.

In Hamilton, the Court accepted defendants' argument that they "have a legitimate penological interest in carrying out their responsibility for daily preparation of meals for all inmates," and that imposing additional burdens for specialized meals represented an unreasonable demand on prison officials.  Id., 2009 WL 3199520, at *4.  The fact that

31

meals were provided from standardized menus generated by the state, and that further deviation from those menus would represent a budgetary and administrative burden satisfied the first Turner factor and weighed in favor of the defendants. Id., 2009 WL 3199520, at *4-*5. The same is true in the present case.

Moreover, the second Turner factor also weighs in the favor of defendants in the instant case. There is nothing in the record that indicates that Tafari was unable to exercise his rights to practice his religion. Tafari was provided the Kosher CAD meals three times a day. Thus, he was being provided with food that complies with his religious tenets. It is not the diet which Tafari feels would most fully have complied with his beliefs, but it was adequate nonetheless. Moreover, there is no evidence in the record indicating "that Defendants have prevented [Tafari] from studying, praying, . . . or attending ceremonies and rituals." Hamilton, 2009 WL 3199520, at *5.

Furthermore, the third Turner factor also weighs in favor of defendants in the current action because, similar to the prison officials in Hamilton, the defendants argue that the impact of the accommodation of the vegetarian kosher menus would greatly affect the prison both financially and administratively. Hamilton, 2009 WL 3199520, at *6. Defendants examined the feasibility of providing additional or variant kosher programs after the implementation of the Green Haven program and determined that the difficulties and expense in preparing the food in facilities as well as the additional staffing which would be required prohibited the creation of additional programs.

Moreover, DOCCS statewide menu already offered both vegetarian and kosher options to inmates. Furthermore, with the provision of the side dishes, dessert, and drinks, an inmate could forego an entree option that was not palatable and still consume a nutritionally

adequate meal.  Requiring additional accommodations, particularly the vegetarian kosher diet, "could have a significant ripple effect on fellow inmates, in that such an accommodation would open the door to the creation of various specialized menus for other inmates with different therapeutic and religious needs." Id. (internal quotation marks and citations omitted).  Accordingly, the Court should remain "deferential to the informed discretion of corrections officers." Turner, 482 U.S. at 90.  Additionally, there is nothing in the record to indicate that defendants' position is unreasonable. See Giano v. Senkowski, 54 F.3d 1050, 10544 (2d Cir. 1995) ("The prisoner-plaintiff bears the burden of proving that the disputed regulation is unreasonable.").  If anything, defendants have advanced a multitude of reasonable arguments regarding administrative and financial concerns which led to the conclusion that additional alternative diets were not feasible.

The fourth Turner factor requires the Court to consider the existence of alternative means of facilitating the right which imposes only a de minimus effect on the valid penological interests.  Tafari has provided multiple alternative menus, using food products which are already available, as well as providing affidavits from inmates with verified food allergies who also substitute available food products for menu items which they could not safely consume.  Accordingly, the final factor weighs in favor of Tafari.

Considering all factors together, it was not unreasonable for defendants to follow the state-approved menus and only offer Tafari the CAD as his kosher option, despite Tafari's complaints that the present kosher diet was insufficient for his religious and health needs.  The CAD provided Tafari with a nutritionally adequate diet, even if he refused to eat the kosher meat that was provided during some meals.  While it was not the diet of his choosing, it was still adequate and reasonable given the aforementioned application of the

33

Turner test.  Accordingly, defendants' motion as to these claims should be granted.

### e.  Transfer to Green Haven Kosher Food Program[17]

Tafari claims that his First Amendment rights were being continually violated by the failure of DOCCS defendants to send him to Green Haven whereupon he could receive a vegetarian kosher meal which was consistent with his religious beliefs.  However, it has been regularly stated that the Green Haven Kosher food program is not a vegetarian diet and thus does not represent a vegetarian alternative to the CAD.  Therefore, the question returns to whether the failure to provide a vegetarian kosher diet is an infringement on Tafari's First Amendment.  As discussed supra, it is not, thus defendants' motion on this ground is granted.

### 2. Dreadlocks

"A fundamental tenet of the religion is that a Rastafarian's hair is not to be combed or cut, resulting in rope-like strands known as 'dreadlocks.'" Benjamin v. Coughlin, 905 F.2d

---

[17] Inmates do not have the right under either the Constitution or New York law to remain or be transferred to the facility of their choosing.  Montanye v. Haymes, 427 U.S. 236, 242-43 (1976); Meriwether v. Coughlin, 879 F.2d 1037, 1045-46 (2d. Cir. 1989).  Therefore, Tafari did not have the right to be retained at Green Haven.  Furthermore, Tafari's denials to the program were all based on his behavior regardless of the fact that he had no constitutional right to compel his transfer there.  Because it was an Honor's Program, Tafari's repeated denials to Green Haven were based, in part, on his extensive disciplinary record.  Additionally, Tafari was previously housed at Green Haven when he also amassed a large number of disciplinary sanctions and, therefore, making transfer back to the facility extremely unlikely.  Finally, Tafari alleges that defendant Rabbis precluded his transfer to Green Haven due to racial bias and discrimination.  All Tafari proffers to support these claims are conclusory arguments which are insufficient to withstand the present motion.  Accordingly, defendants' motion should be granted as to all such claims.

571, 573 (2d Cir. 1990).  This circuit has held that requiring Rastafarians to cut their hair

violates their right to the free exercise of religion.  Id. at 576-77.  Tafari claims to be a

"Jewish/Hebrew/Israelit/Ethiopian (Orthodox Jew-ism), Nayabinghi House of Jah Rastafari,

a Rastarfarian sect of the line of Judah."  See supra n. 3.  However, Tafari also contends

that, despite the name, he is Jewish.  DOCCS also classified Tafari as Jewish, leading to its

determination that Tafari could not wear dreadlocks.

Recently, the Western District of New York has determined that DOCCS policy

regarding dreadlocks for those who are not identified as a Rastafarian violates the First

Amendment.

> [T]he fatal flaw of DOC[C]S' policy is that it is not neutral-it permits or denies
> dreadlocks based not upon the sincerity of the inmate's belief, but upon DOC[C]S'
> assessment of the validity of that religious belief. Even under a less stringent
> standard, however, this lack of neutrality renders the governmental objective
> suspect. Stated another way, there is no legitimate reason for DOC[C]S to afford
> members of only one religious denomination the opportunity to adhere to a
> sincerely held religious belief precluding cutting of hair. Requiring inmates to
> affiliate with that religious denomination in order to exercise their sincere religious
> belief in the wearing of dreadlocks is not an adequate alternative means for
> members of other denominations to exercise their religious beliefs and seems more
> likely to foster conflict within that religious population than permitting inmates to
> exercise that practice within their own denominations.

Amaker v. Goord, No. 06-CV-490, 2010 WL 2595286, at *12 (W.D.N.Y. Mar. 25, 2010)

(attached to Report Recommendation as Ex. 4); see also Pilgrim v. Artus, No. 07-CV-1001

(GLS/RFT), 2010 WL 3724883, at *11-*13 (N.D.N.Y. Mar. 18, 2010) (denying summary

judgment because there were questions of material fact as to the reasonableness of the

DOCCS policy requiring all inmates to cut their dreadlocks unless they were Rastafarians)

(Dkt. No. 122-1 at 46-61).

In this case, the same applies.  DOCCS determined that Tafari was Jewish, despite the

new designation he provided on his religious forms.  Accordingly, DOCCS did not credit

Tafari's sincerely held religious belief as being a member of the Jewish/Hebrew/Israelit/

Ethiopian (Orthodox Jew-ism), Nayabinghi House of Jah Rastafari, a Rastarfarian sect of

the line of Judah.  Based upon defendants' conclusions, Tafari was prohibited from wearing

dreadlocks.  This prohibition, at the least, raises a question of material fact as to whether

defendants' actions impermissibly burdened Tafari's right to the free exercise of his religion.

Therefore, defendants' motion should be denied on this ground as to these claims.


### E. Eighth Amendment

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual

punishment."  U.S. Const. amend. VIII.  "The Constitution does not mandate comfortable

prisons but neither does it permit inhumane ones, and it is now settled that the treatment a

prisoner receives in prison and the conditions under which he is confined are subject to

scrutiny under the Eighth Amendment."  Farmer v. Brennan, 511 U.S. 825, 832 (1884). This

includes the right to "receive adequate food, clothing, shelter, and medical care . . . . " Id.

(citations omitted).

As with other Eighth Amendment claims, a "plaintiff must satisfy both an objective . . .

and subjective test."  Jolly v. Coughlin, 76 F.3d 468,  480 (2d Cir. 1996) (citations omitted).

Thus, "a prisoner may prevail only where he proves both an objective element – that the

prison officials' transgression was sufficiently serious– and a subjective element – that the

officials acted, or omitted to act, with a sufficiently culpable state of mind . . . ." Phelps v.

Kapnolas, 308 F.3d 180, 185 (2d Cir. 2002) (internal quotation marks and citations omitted).

The objective prong can be satisfied by

36

conditions of confinement . . . [which] in combination [constitute an Eighth Amendment violation] when each would not do so alone . . . [such as] when the conditions have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise – for example, a low cell temperature at night combined with a failure to issue blankets.

Davidson v. Murray, 371 F. Supp. 2d 361, 370 (W.D.N.Y. 2005) (citations omitted).

However, "[n]othing so amorphous as overall conditions can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." Id. (citing Wilson v. Seiter, 501 U.S. 294, 304-05 (1991)).  The subjective prong requires "a prison official [to] have a sufficiently culpable state of mind . . ., of deliberate indifference to inmate health or safety" Farmer, 511 U.S. at 834 (citations omitted).  As to restrictive diets, no constitutional violation will be found unless the "diet was nutritionally inadequate, posed an imminent health risk, or physically injured [the inmate] . . . ." McEachin v. McGuinnis, 357 F.3d 197, 199-201 (2d Cir. 2004) (citations omitted).

Tafari claims that the failure to provide him with a vegetarian kosher meal led to a host of digestive problems and weight loss.  The limited medical information which Tafari provided, however, fails to demonstrate that he was suffering from any type of serious medical condition.  Moreover, it is undisputed that the CAD was provided to Tafari every day, for three meals a day, and that he was eating the diet although he was dissatisfied with it.  Thus, Tafari has failed to establish that he was not receiving an adequate diet or that prison officials were deliberately indifferent.

Tafari also contends that during the two weeks he was on the restricted, loaf diet, he was in danger.  Similarly, these claims are insufficient to withstand the present motion. Tafari claims to have been suffering from various symptoms which were documented by medical staff.  However, the record fails to include these references. Conclusory allegations

37

of constitutional violations alone, without competent medical evidence, are insufficient to establish a significant risk to inmate health necessary to defeat a motion for summary judgment.  Llorente v. Rozeff, et. al., No. 99-CV-1799, 2001 WL 474261, at *3-*4 (N.D.N.Y. Apr. 12, 2001) (explaining that plaintiff was required to present competent medical evidence of both the injury and the reaction to support claim of deliberate indifference to a serious medical need) (Dkt. No. 122-1 at 40-43).  Moreover, the loaf diet came with cabbage and water in conjunction with the bread and it has been deemed nutritionally adequate.  Tafari does not proffer evidence that this diet, though not kosher, remained nutritionally inadequate for him.  Additionally, as discussed above, he also fails to establish that he was experiencing a serious risk to his health.  Moreover, the denial of kosher food, in and of itself, is insufficient to establish an Eighth Amendment claim.  Modlenaar v. Liberatore, No. 07-CV-6012, 2009 WL 2179661, at *5 (W.D.N.Y. July 22, 2009) (citing cases) (attached to Report Recommendation as Ex. 5).

Accordingly, defendants' motion as to these claims should be granted on this ground.

### F. Personal Involvement

"'[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'"  Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991)).  Thus, supervisory officials may not be held liable merely because they held a position of authority.  Id.; Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996).  However, supervisory personnel may be considered "personally involved" if:

(1) [T]he defendant participated directly in the alleged constitutional

38

violation;

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citing Williams v. Smith, 781 F.2d 319, 323-24 (2d Cir. 1986)).[18]

Defendants generally allege that all individuals, specially those who were managerial or supervisory officials, have not been shown to have been personally involved in the alleged constitutional violations.  Given defendants vague assertion and the fact that the only constitutional violation which survived this Report-Recommendation involving managerial or supervisory officials was the January 24 through March 24, 2005 denial of kosher meals, only those defendants will be addressed.

_____

[18]  Various courts in the Second Circuit have considered how, if at all, the Iqbal decision affected the five Colon factors which were traditionally used to determine personal involvement.  See McCarroll v. Fed. Bureau of Prisons, No. 08-CV-1343 (DNH/GHL), 2010 WL 4609379, at *4 (N.D.N.Y. Sept. 30, 2010) (noting that although the Second Circuit has not yet addressed Iqbal's impact on the five Colon factors, several district courts have done so); Kleehammer v. Monore County, 743 F. Supp. 2d 175 (W.D.N.Y. 2010) (holding that "[o]nly the first and part of the third Colon categories pass Iqbal's muster . . . ."); D'Olimpio v. Crisafi, 718 F. Supp. 2d 340, 347 (S.D.N.Y. 2010) (disagreeing that Iqbal eliminated Colon's personal involvement standard).

### 1. Miller and Butler

Tafari continually wrote letters of complaint to Miller and Butler, voicing his displeasure that his kosher meals were still not being provided to him.  Miller and Butler effectively ignored all of these letters.  It is on these grounds which Tafari relies to establish personal involvement of these defendants.

Ignoring letters of complaint is insufficient to establish personal involvement.  See Bodie v. Morgenthau, 342 F. Supp. 2d 193, 203 (S.D.N.Y. 2004) (citations omitted) (finding personal involvement only where a supervisory official received, reviewed, and responded to a prisoner's complaint); Johnson v. Wright, 234 F. Supp. 2d 352, 363 (S.D.N.Y. 2002) ("[I]f mere receipt of a letter or similar complaint were enough, without more, to constitute personal involvement, it would result in liability merely for being a supervisor, which is contrary to the black-letter law that § 1983 does not impose respondeat superior liability.") (citations omitted).  Similarly, receipt of a letter, without personally investigating or acting on the letter or grievance, is insufficient to establish personal involvement.  See, e.g., Rivera v. Fischer, 655 F. Supp. 2d 235, 238 (W.D.N.Y. 2009) (citing cases).

Accordingly, defendants' motion on this ground as to Miller and Butler should be granted.


### 2. Goord

Tafari also wrote letters of complaint to defendant Commissioner Goord during this time.  Goord forwarded the letters to defendant Nuttal, who responded to Tafari on Goord's behalf.  To the extent Goord's actions in referring these complaints to the appropriate correctional facility or Superintendents are alleged to render him personally involved, such

contentions are meritless as such delegation is an appropriate prerogative of supervisory officials.  See Bodie, 342 F. Supp. 2d 193, 203 (citations omitted) (finding personal involvement where supervisory official received, reviewed, and responded to an inmate's complaint); Garrido v. Coughlin, 716 F. Supp. 98, 100 (S.D.N.Y.1989) (holding that Commissioner not personally liable for ignoring plaintiff's letter of protest and request for an investigation).  Accordingly, defendants' motion on this ground as to Goord should be granted.

### 3. Nuttal and Wendland

Conversely, defendants Nuttal and Wendland are personally involved for the same reasons which relieved Goord of responsibility.  Nuttal received Tafari's letter of complaint, assessed it, and decided to initiate an investigation in response to it.  Similarly, Wendland received Tafari's letters and responded that allegations of harassment were being determined by the grievance program but that otherwise Tafari was required to engage in certain steps to notify the chaplain and facility  properly prior to being able to receive kosher meals.  Therefore, Nuttal and Wendland were more engaged than the other defendants in the instant action.  See Bodie v. Morgenthau, 342 F. Supp. 2d 193, 203 (S.D.N.Y. 2004) (citations omitted) (finding personal involvement only where a supervisory official received, reviewed, and responded to a prisoner's complaint).  Accordingly, defendants' motion on this ground as to Nuttal and Wedland should be denied.

### G. Qualified Immunity

Defendants also contend that they are entitled to qualified immunity.  Qualified

41

immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Aiken v. Nixon, 236 F. Supp. 2d 211, 229-30 (N.D.N.Y. 2002) (McAvoy, J.), aff'd, 80 Fed.Appx. 146 (2d Cir. Nov. 10, 2003).  However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights . . . immunity might still be available as a bar to . . . suit if it was objectively reasonable for the public official to believe that his acts did not violate those rights."   Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir.1991) (citations omitted).

A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation.  Saucier v. Katz, 533 U.S. 194, 201 (2001).  Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights, of which a reasonable person would have known, were clearly established at the time of the alleged violation. Aiken, 236 F. Supp. 2d at 230.  Here, the second prong of the inquiry need not be reached as to all claims because, as discussed supra, accepting all of Tafari's allegations as true, he has not shown that all of these defendants violated his constitutional rights.

However, with respect to Tafari's claims against (1) Wendland and Nuttal regarding the eight weeks he waited to receive kosher meals after transferring to Eastern and (2) Poole for issuing disciplinary charges when Tafari failed to cut his hair, the second prong of the analysis need be considered.  There is no question that it was well settled on October 25, 2006 that the First Amendment required that inmates are to be provided with the ability to exercise their religious beliefs, including the right to a diet which comports with their

42

religious beliefs.  As there is no dispute about this clearly established law with respect to providing a kosher meal, it cannot be said that defendants Wendland or Nuttal were unaware of the right.  Accordingly, these claims cannot be dismissed on the basis of qualified immunity at this stage.

Conversely, "[a]lthough the Second Circuit has previously ruled that *Rastafarians* have a First Amendment right to maintain their dreadlocks absent a valid penological interest that requires their preclusion, neither the Supreme Court nor the Second Circuit has ruled that other, *non-Rastafarian* inmates are similarly entitled to such protections."  Pilgrim, 2010 3724883, at *17 (citations omitted).  Accordingly, "qualified immunity would apply to all those who participated in [the DOCCS dreadlocks policy] creation and enforcement."  Id. Thus, defendants' motion as to Poole on this ground should be granted.

Accordingly, defendants' motion on this ground should be granted in the alternative as to all defendants except Nuttal and Wendland for the claims discussed above.

### III. Motion to Compel

Tafari filed a motion pursuant to Fed. R. Civ. P. 37 to compel defendants to provide discovery and revoke the previously entered court ordered extension providing defendants more time to produce their discovery.  Dkt. No. 117.  That motion was served before defendants filed their motion for summary judgment.  Dkt. No. 122.

At the outset of the case, this Court filed a "Mandatory Pretrial Discovery and Scheduling Order in Civil Rights Actions Brought by Inmates Pro Se." a standardized order filed in this district in all such cases.  Dkt. No. 102.  It required both the plaintiff and the defendants to serve an opposing party with certain discovery materials without the

necessity of a discovery request.  Id.  Its stated purpose is "[t]o expedite the fair disposition of this action and to discourage wasteful pretrial activities . . . ."  Id. at 1.  The order does not preclude a plaintiff or defendant from seeking additional discovery from an opposing party, but, given the order and its purpose, such additional discovery must not be cumulative, overbroad, or unduly burdensome, and must satisfy the requirements of relevance under Fed. R. Civ. P. 26. Defendants sought, and received, an extension to file their dispositive motions and discovery on June 16, 2011.  Dkt. Nos. 115, 116.  Immediately thereafter, Tafari filed the present motion to compel, arguing that he should have been given the opportunity to oppose it and seeking immediate reversal of the extension.  Dkt. No. 117.  On August 24, 2011, defendants filed their motion for summary judgment.  Dkt. No. 122.

Defendants now having filed a motion for summary judgment, the threshold issue on Tafari's motion to compel is whether the additional discovery could reasonably alter the outcome of defendants' motion.  Given the voluminous record which was reviewed in conjunction with determining these motions and the lack of specificity of Tafari's requests, granting any additional discovery would not.  Moreover, because Tafari's claims are obtuse and overbroad, the information sought is unclear and, no matter its content, would not affect the outcome of defendants' motion.

Accordingly, Tafari's motion to compel is denied.


## IV.  Conclusion

For the reasons stated above, it is hereby:

1. **RECOMMENDED** that:

44

A. Defendants' motion to dismiss pursuant to § 1915(g) (Dkt. No. 118) be **DENIED**; and

B. Defendants' motion for summary judgment (Dkt. No. 122) be:

1. **DENIED** as to Tafari's First Amendment claims regarding the failure of defendants Wendland and Nuttal to provide Tafari a kosher meal between January 24 and March 24, 2005; and

2. **GRANTED** as to all other claims and defendants; and

2. **ORDERED** that Tafari's motion to compel (Dkt. No. 117) is **DENIED**.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the . . . recommendation."  N.Y.N.D.L.R. 72.1(c) (citing 28 U.S.C. §636(b)(1)(B)-(C)).  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Small v. Sec'y of HHS, 892 F.2d 15 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).


Dated:  March 6, 2012
      Albany, New York

_____
David R. Homer
U.S. Magistrate Judge